**Edward STOCKLEY, Plaintiff,**

**v.**

**AT & T INFORMATION SYSTEMS, INC., Defendant.**

**CV 86–1643 (RJD).**

United States District Court, E.D. New York.

May 25, 1988.

Jay M. Gallinger, DiLorenzo and Weber, Huntington Station, N.Y., for plaintiff.

Daniel A. Rizzi, Kramer, Levin, Nessen, Kamin & Frankel, New York City, for defendant.

## MEMORANDUM AND ORDER

DEARIE, District Judge.

AT & T Information Systems, Inc. (ATTIS), the defendant in this defamation action, has moved for an order dismissing the complaint pursuant to Rule 12(b)(6) and for summary judgment pursuant to Rule 56(b) of the Federal Rules of Civil Procedure. For the reasons stated below, the defendant's motions are granted.

### FACTS

During late 1984 and early 1985, Edward Stockley, the plaintiff, was employed by ATTIS as a Business Office Manager in ATTIS' Jericho, Long Island, office. His responsibilities included training new ATTIS sales representatives, many of whom were women.

In late January, 1985, John P. McCormack, an executive in ATTIS' personnel office, received an anonymous letter, signed "Sales Representative," complaining about working conditions and management at the Jericho office. Among the numerous gripes presented in the letter were charges that Ted Minor, Stockley's direct supervisor, had engaged in sexual harassment, that a hostile work environment existed at the Jericho office, and that union grievances in connection with harassment were pending against Minor and Stockley. McCormack Aff. Ex. A. McCormack initiated investigations into all of the complaints raised in the anonymous letter. Defendant's Brief at 7 n. 15; McCormack Aff. ¶ 6. Only the charges of sexual harassment are germane to this case, and the details of the resulting investigation are of critical importance to the issues raised by defendant's motion.

During the month of February, 1985, McCormack and his staff went to the Jericho office to investigate the sexual harassment allegations. After being promised anonymity, more than 20 employees made statements to the investigators; a number of these implicated Stockley (and Minor) in behavior that could be considered sexual harassment. Stockley and Minor were also interviewed.

McCormack states that he and his staff took notes during the interviews and later typed the notes verbatim. McCormack Reply Aff. ¶ 4. The handwritten notes have not been produced, but the typewritten notes were presented to the Court, with the names of the interviewees deleted. McCormack Aff. Ex. D; Dahut Aff. Ex. F. The interview notes were summarized in a table, with detailed explanatory footnotes, that was made part of McCormack's report on Stockley and Minor. Dahut Aff. Ex. A Tab 3. The report was prepared during the first week of March, 1985, and transmitted to William L. Dahut, Stockley's and Minor's superior in the ATTIS chain of corporate command. McCormack's superiors in the personnel office may also have seen the report.

In addition to the summary of the interview notes, McCormack's report included information from Carol Resta, to whom the investigators had been led by some of their interviews. Resta had been transferred to ATTIS' Jericho office in December, 1985, and had worked briefly under Stockley's supervision before quitting. The McCormack report included a letter from Resta to Paul Caswell, an ATTIS executive, that was dated February 6, 1985, and a letter from Resta to McCormack that was written after McCormack had interviewed her. In both letters, Resta claimed that she left ATTIS because of Stockley's frequent harassment of her, including unwanted touching and comments laden with sexual innuendo. McCormack Aff. Exs. E, F, G; Dahut Aff. Ex. A Tab 2. She has repeated this claim under oath. McKee (nee Resta) Aff. ¶¶ 2–3, 7, 9. Resta never filed suit against ATTIS; in a settlement executed on May 8, 1985, she released ATTIS from possible liability for sex discrimination in exchange for reinstatement with back pay. McKee Aff. Ex. E.

Stockley was questioned about the charges against him on March 19, 1985 in an interview with McCormack, Wade Taylor (on McCormack's staff) and Richard Kline (on Dahut's staff). During this interview (and later, at deposition), Stockley denied some of the specific incidents alleged, admitted others, and denied that any of them had sexual motivations or overtones. McCormack Aff. Exs. J, K; Rizzi Aff. Ex. G. The next day, Dahut directed that McCormack be sent back to Jericho to secure signatures on the typed notes of the earlier "confidential" statements provided by employees. Stockley Aff. Ex. D. Effective March 21, 1985, Kline suspended Stockley pending final discipline. Dahut Aff. Ex. D.

McCormack objected to seeking the interviewees' signatures, noting the prior promise of confidentiality. Stockley Aff. Ex. D. Nevertheless, on March 29, he and his staff returned to Jericho. A number of the interviewees no longer worked at Jericho, or were out of the office, and thus were unavailable to sign their statements. Of those who did sign, many objected to doing so, and many availed themselves of the opportunity McCormack offered to amend or add to his typewritten notes. The signed statements, as amended, were forwarded to Dahut on April 1. On April 9, 1985, W. Richard White—Dahut's immediate subordinate—met with Stockley and imposed final discipline on him, including transfer to another unit, loss of a merit pay increase, and mandatory sensitivity training. Dahut Aff. ¶¶ 8, 10, Ex. D. A memorandum describing the reasons for and nature of Stockley's discipline was subsequently placed in his personnel file. Ex. to Second Amended Complaint, Rizzi Aff. Ex. C.

Stockley worked for ATTIS at his new location from April 1985 to October 1985. In resigning from ATTIS, he accepted an incentive package that ATTIS was offering its executives in an effort to reduce its work force. Rizzi Aff. Ex. I. Stockley took a new job with a company partly

owned by his brother. Rizzi Aff. Ex. G. at 48.

## THE COMPLAINT

On April 8, 1986, plaintiff commenced this suit in New York State Supreme Court. Plaintiff filed an amended complaint approximately three days later. Defendant removed the case to this Court on May 16, 1986. After discovery, plaintiff filed a second amended complaint on May 6, 1987, which defendant answered on June 19, 1987.

The second amended complaint seeks one million dollars in compensatory damages, plus punitive damages, on two claims for relief: the first for slander and the second for libel. In his brief in opposition to ATTIS' motion to dismiss, the plaintiff identifies four specific, allegedly defamatory, communications. They are:

1. All statements regarding Stockley made by McCormack in his report of the Jericho investigation, including the table and text summarizing McCormack's interviews with Jericho employees;

2. The typed notes which McCormack and his staff asked the Jericho employees to sign, which plaintiff asserts were prepared after March 20, 1985;

3. White's oral statements of the reasons for disciplining Stockley, which were made at the April 9, 1985, meeting;

4. The memo placed in Stockley's personnel file sometime after April 24, 1985.

Defendant urges dismissal of the complaint on the grounds that claims based on this group of statements are barred by the statute of limitations, fail to state a claim for defamation, and fail to raise material issues of fact on several elements of a defamation cause of action.

## STATUTE OF LIMITATIONS

New York applies a one-year statute of limitations to intentional torts, including libel and slander. N.Y.Civ.Prac.Law § 215 subd. 3 (McKinney 1972 & Supp.1988). Because this action was commenced on April 8, 1986, any claim for relief based on an allegedly defamatory publication that took place before April 8, 1985 is time-barred. Therefore, plaintiff's claims that are based upon McCormack's investigation report or the typed notes offered for signature to the Jericho employees, both of which were undisputedly prepared prior to April 1, 1985, must be dismissed.

Plaintiff concedes the applicability of a one-year statute of limitations but contends that claims based on the McCormack report and interview notes are not barred because they were republished during the limitations period. Oral Arg. Tr. at 17–20; Plaintiff's Brief at 9–10. The Court concludes that plaintiff's position lacks merit, in light of applicable New York authority.

■ The general rule in New York is that the statute of limitations in an action for libel runs from the time of first publication. *Gregoire v. G.P. Putman's Sons,* 298 N.Y. 119, 81 N.E.2d 45 (1948); *Berger v. Gilbert,* 65 A.D.2d 882, 410 N.Y.S.2d 427 (3d Dept. 1978). *Gregoire* did, however, leave room for an exception to the rule: separate and later republications in a different form. In recent years that exception has been applied. *See Rinaldi v. Viking Penguin, Inc.,* 73 A.D.2d 43, 425 N.Y.S.2d 101 (1st Dept. 1980) (reissue in paperback of book previously published in hardcover constituted separate publication for statute of limitations purposes); *see generally* Practice Commentary C215:3 to N.Y. Civ.Prac.Law § 215 (McKinney 1972 & Supp.1980). These cases relate to printed and commercially marketed works, and offer little direct guidance for the application of New York's rule here. However, they certainly offer no support for plaintiff's position.

The precise nature of plaintiff's claim that the McCormack statements were republished is not exactly clear. One theory seems to be that each time an ATTIS official reviewed the McCormack documents—before meeting with Stockley and before writing the memo to Stockley's file—McCormack's alleged libel was published anew. This theory is clearly defeated by New York's single publication rule. *See Gregoire, supra; Osmers v. Parade Publi-*

*cations, Inc.*, 234 F.Supp. 924 (S.D.N.Y. 1964); *cf. Rinaldi, supra.* The rule is designed to restrict the subject of an allegedly defamatory writing to a single cause of action that accrues when the writing is released to its intended audience. *Sorge v. Parade Publications, Inc.*, 20 A.D.2d 338, 247 N.Y.S.2d 317 (1st Dept. 1964). It protects publishers from facing a new cause of action each time a copy of a book is sold from a given printing, *id.*, and *a fortiori* each time a purchaser lends the book to someone else to read. McCormack's report was published when it was made available to ATTIS executives, and their later readings of the same document cannot give rise to a new cause of action, despite plaintiff's contentions.

■ Plaintiff also seems to argue that White's oral statements and the memo to Stockley's file are republications of McCormack's allegedly libelous statements and therefore somehow revive a time-barred cause of action based on McCormack's original statements. This proposition is equally untenable. *See Rinaldi, supra* (no cause of action against original authors of book when decision to reissue book in paperback was beyond their control). Thus the statute of limitations bars plaintiff from asserting any libel claim based upon the McCormack report and interview notes.

■ ATTIS attempts an additional twist on the concept of republication, challenging as time-barred the memorandum written to Stockley's personnel file and the statements made by White at the April 9 meeting. ATTIS contends that these incidents are nothing more than republications of McCormack's original statements. Therefore, ATTIS argues, an action based on the later republications is time-barred just as is an action based on McCormack's statements.

The only evidence about the April 9 meeting with White indicates that White informed Stockley of his final discipline and also "counseled" Stockley. Rizzi Aff. Ex. H. Even if it is fair to infer that White also "reviewed with plaintiff all of the allegations, charges and findings of sexual harassment against him," Plaintiff's Brief at 5, there is no proof at all that White was simply restating McCormack's earlier statements. Certainly, if the paperback reissue in *Rinaldi* was sufficient under New York law to constitute a separate publication by a party other than the original authors, any allegedly defamatory statements published by White at the April 9 meeting would similarly be distinct from McCormack's written words. The same is true for the memo to Stockley's file, assuming appropriate proof of publication.

In sum, then, plaintiff's complaint must be dismissed to the extent that it alleges defamation in McCormack's report and interview notes. To the extent that the complaint alleges defamation based on White's April 9 statements and the memo to plaintiff's personnel file, the Court concludes only that the complaint withstands a statute of limitations challenge. However, these remaining claims (as well as the time-barred ones) cannot survive the plaintiff's failure to raise a material issue of fact sufficient to defeat defendant's defense of qualified privilege, which is clearly established by undisputed facts.

## QUALIFIED PRIVILEGE

Defendant argues that any statements made by its employees during the course of an investigation into sexual harassment charges against Stockley are protected by a qualified privilege. The Court agrees.

Venerable New York law holds that

A communication made *bona fide* upon any subject matter in which the party communicating has an *interest*, or in reference to which he has a *duty*, is privileged if made to a person having a corresponding *interest or duty*, although it contained incriminating matter which, without this privilege, would be slanderous and actionable; and this though the duty be not a legal one, but only a moral or social duty of imperfect obligation.

*Byam v. Collins*, 111 N.Y. 143, 150, 19 N.E. 75 (1888) (emphasis in original). ATTIS urges that, because it had a legal duty to investigate the charges against Stockley, communications among its execu-

tives in the exercise of that duty are protected by the privilege established in *Byam*. To hold otherwise, ATTIS suggests, would leave it and similarly situated employers between the rock of defamation suits and the hard place of liability under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.*

■ Title VII requires employers to investigate and act upon serious allegations of sexual harassment. *Bundy v. Jackson*, 641 F.2d 934, 947 (D.C.Cir.1981); *Munford v. James T. Barnes & Co.*, 441 F.Supp. 459 (E.D.Mich.1977); *see Meritor Savings Bank v. Vinson*, 477 U.S. 57, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). The guidelines of the Equal Employment Opportunity Commission, which filed an *amicus curiae* brief in support of defendant's motion, codify that duty. 29 C.F.R. § 1604.11(f).

■ Here, the facts available to ATTIS plainly triggered its obligations under Title VII. The anonymous letter, while not terribly specific and not primarily aimed at Stockley, did provide reasonable grounds for beginning an investigation when it charged that

> There is much sexual harassment from Ted Minor. There are union grievances against him and the assistant manager Ed Stockley. Ted Minor walks around the office insulting women all the time sexually and I'm not using the word loosely. Speaking about ones [sic] breasts and buttocks, bras etc., is common place [sic] at 2 Jericho Plaza.

Dahut Aff. Ex. A Tab 2, anonymous letter at 2. McCormack's decision to investigate was the only prudent choice a corporate officer in his position could have made. And the results of the interviews certainly made it clear that ATTIS, if it were to obey the requirements of Title VII, had to do something about the Jericho office environment. *See Meritor, supra.* Indeed, even if the Court were to accept plaintiff's highly improbable assertion that all the inculpatory interview notes were fabricated and all the non-inculpatory ones were genuine, it is undisputed that McCormack's investigation led him to Carol Resta. Resta had complained about harassment from Stock-

ley to her co-workers, to a union representative, and in writing to an ATTIS executive before she ever met McCormack. Dahut Aff. Ex. A Tab 2, Tab 4; Dahut Aff. Ex. F, Witness Statements C, G, H, N, P, Q, R; Stockley Aff. Ex. B, Arroyo Aff. Resta repeated her complaints to McCormack and confirmed them in writing, listing specific incidents that, collectively, would likely fall well within the broad definition of sexual harassment. Dahut Aff. Ex. A Tab 2. A number of these incidents, according to McCormack, were corroborated by other Jericho employees, and he believed her allegations. McCormack Aff. ¶¶ 11–13, Ex. E. But even if McCormack had doubted Resta's word, and even if (as plaintiff argues without factual support) no corroboration had existed, the mere fact that she made specific allegations of Title VII violations would have been sufficient to justify McCormack's continuing investigation of and report on the allegations against Stockley. Title VII demands no less.

As soon as ATTIS reasonably believed that Title VII required it to act on the allegations against Stockley, the company had an "interest or duty" within the meaning of *Byam, supra.* This conclusion is compelled not just by the plain language of *Byam* but also by the strong federal policy favoring vigorous enforcement of federal civil rights statutes. As the EEOC argued to this Court, private compliance and enforcement procedures are essential to the success of EEOC's efforts to eliminate employment discrimination. Such private enforcement would be undermined if statements made during investigations were not protected by a qualified privilege. The Court agrees with the Fifth Circuit—apparently the only federal appellate court that has written on this question—that communications made in connection with *bona fide* Title VII investigations are protected by a qualified privilege. *Garziano v. E.I. du Pont de Nemours & Co.*, 818 F.2d 380, 386–88 (5th Cir.1987).

Under New York libel law, that privilege extends only to communications made to persons who have an interest or duty "corresponding" to the interest or duty that

creates the privilege. *Byam, supra.* Moreover, the "qualified" nature of the privilege means that those who make statements "actuated by express malice or actual ill-will," *Stukuls v. State,* 42 N.Y.2d 272, 279, 366 N.E.2d 829, 834, 397 N.Y.S.2d 740, 745 (1977) (quoting *Ashcroft v. Hammond,* 197 N.Y. 488, 495–96, 90 N.E. 1117, 1120 (1910)), are not immunized from liability. Plaintiff essentially concedes the existence of a qualified privilege, but argues that allegedly defamatory statements were made outside the scope of the privilege and with actual malice. Plaintiff's Brief at 11.

Plaintiff has sufficiently alleged malice and unprivileged publication, thus surviving the defendant's motion to dismiss pursuant to Rule 12(b)(6). However, the proof presented to the Court, after more than a year of discovery, unequivocally establishes that there is no genuine issue of material fact with respect to these allegations, and summary judgment for defendant must be granted pursuant to Rule 56(b).

Plaintiff correctly points out that a movant for summary judgment bears the burden of establishing the absence of a material fact issue. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 99 S.Ct. 1598, 26 L.Ed.2d 142 (1970). However, once that initial burden is carried—as defendant's extensive submission in support of its motion did—it is up to the non-moving party to establish that a genuine fact issue exists. *Matsushita Elec. Indust. Co. Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The showing in opposition to a summary judgment motion must raise more than "some metaphysical doubt" about the facts, *id.* at 586, 106 S.Ct. at 1356, and it must be supported by evidence, not by mere allegations or speculation. Fed.R.Civ.P. 56(e); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see Law Firm of Daniel P. Foster v. Turner Broadcasting System,* 844 F.2d 955 (2d Cir.1988) (affirming grant of summary judgment for defendant in defamation case). In addition, the evidence adduced must exceed the chimerical scintilla; it must be "evidence on which the jury could reasonably find for the plaintiff," taking into consideration the burden of proof and standard of persuasion to be applied at trial. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Here, plaintiff has come forward with essentially no proof in support of its position, much less proof upon which a reasonable jury could find ATTIS liable for the statements at issue in this suit.

■ First of all, plaintiff implies that a material fact issue exists as to whether ATTIS executives made statements to persons who did not share ATTIS' Title VII duties, and thus exceeded the scope of the qualified privilege. There is simply no proof offered to support this assertion. The only claims that survive the statute of limitations defense are those based on oral statements made at the April 9 meeting and on the memo to Stockley's file. Plaintiff absolutely fails to establish that either of these statements was heard or read by anyone other than executives involved in investigating or disciplining Stockley.

Plaintiff presents several affidavits in support of his position that publication outside the scope of the privilege took place. Stockley Aff. Ex. B. Maria Arroyo states that one Vinny Genarro told her that Carol Resta planned to file a baseless harassment suit against Ed Stockley, and that the reasons for Stockley's later discipline were "common knowledge to everyone in the office." Arroyo Aff. ¶¶ 1–2. Pat Hirsch states, "I was advised by another supervisor that Ed Stockley was accused of sexual harassment and suspended from his job." Hirsch Aff. ¶ 1. "Management and non-management employees were all aware of harassment charges filed against Mr. Stockley, thus making this situation 'the talk of the office,' " states Louise Teger in ¶-1 of her affidavit. This office talk, "eventually through the grapevine ... made its way to the employees in Pearl River," where Stockley was reassigned. Parrinello Aff. ¶ 3. Fara Kelsey told Parrinello that exaggerated rumors about Stockley's behavior were "flying around" Pearl River. *Id.* ¶ 4.

What is striking about all these affidavits is that they nowhere link any of the office gossip about Stockley to McCormack, White, Dahut, or any other ATTIS executive involved in the Title VII investigation or in the imposition of discipline on Stockley. All the affidavits prove is that the harassment case was no secret. But that is hardly surprising. Resta had made her complaints widely known before McCormack's investigation even began. McCormack Aff. ¶ 11, Ex. D; Arroyo Aff. ¶ 1. Stockley and his supervisor Minor had both heard about them. McCormack Aff. Exs. I, J. Moreover, the McCormack interviews—which themselves are not alleged to have included any defamatory statements by McCormack or his staff—were bound to set the office abuzz, as one of plaintiff's affiants avers. Parrinello Aff. ¶ 2. Proof of a "grapevine" is not proof of unprivileged communications by ATTIS executives. Rather, the proof adduced by plaintiff supports the inference that rumors about Stockley were spread from all possible sources *but* the ATTIS executives involved in his case. *See Meyers v. Amerada Hess Corp.*, 647 F.Supp. 62, 66–67 (S.D.N.Y.1986) (Weinfeld, J.) (existence of "rumor mill" fails to establish factual basis linking rumors to defendant). Moreover, even if ATTIS told Stockley's coworkers the reasons for his transfer, such communications—including, incidentally, the McCormack interview notes—would also have been privileged, because made in good faith in furtherance of Title VII and the company's written policy against sexual harassment. *Garziano, supra*, 818 F.2d at 387.

Given plaintiff's failure to prove any publication outside the qualified privilege, he must raise a material issue of fact regarding actual malice in order to withstand defendant's summary judgment motion. This the plaintiff also fails to do.

■ A large part of plaintiff's memorandum of law is devoted to a speculative interpretation of behind the scenes events during ATTIS' consideration of what to do about Resta and Stockley. Plaintiff's Brief at 11–15. Succinctly put, plaintiff's theory is that ATTIS was aware that Resta's allegations were false, yet was terrified of a possible Title VII suit; therefore, ATTIS made a conscious and malicious decision to buy peace with Resta and scuttle Stockley's career even though ATTIS thereby risked being sued by Stockley.

Rule 56(e), of course, demands more than an articulable theory in opposition to a motion for summary judgment. Some proof of the theory—at least enough to raise a genuine, material issue of fact—is required. Plaintiff's attempt to marshal facts in support of his hypothesis is far from sufficient to raise a genuine material issue of fact. These unsuccessful efforts fall into three categories.

First, plaintiff presents proof that ATTIS was extremely concerned about potential liability to Carol Resta. ATTIS admits this quite willingly. In fact, ATTIS argues that its "good faith belief as to the truth and strength of [Resta's] charges is perhaps best illustrated by the fact that [ATTIS] reinstated Carol Resta with full back pay." Defendant's Brief at 26. Stockley points to other manifestations of defendant's worry about Resta. For example, the handwritten notes of McCormack's second meeting with Stockley reveal that McCormack said, at one point, "Evidence of harassment here—don't want lawsuit against Co." McCormack Aff. Ex. J at 2. This expresses McCormack's concern, but it in no way supports an inference of malice. McCormack was simply stating—*to Stockley*—his view that genuine evidence of harassment existed.

Second, Stockley argues that he was never confronted with the accusations and evidence against him. Yet McCormack interviewed him twice, and at the second meeting Stockley was given an opportunity to respond to each of the charges against him. McCormack Aff. Ex. D, Witness Statement O (Stockley); McCormack Aff. Ex. J; Stockley Aff. ¶¶ 3–4. To support his contention that ATTIS prevented him from presenting evidence in his behalf, Stockley offers the Arroyo affidavit, Stockley Aff. Ex. B. At ¶ 3 of her affidavit, Arroyo states that her *union*—not ATTIS—discouraged her from volunteering potentially

exculpatory evidence. She also states that McCormack's staff never approached her. However, the mere failure to interview a given individual who believed in Stockley's innocence cannot prove malice when considered against the record of over twenty witness interviews, some of which produced evidence of sexual harassment by plaintiff and some of which did not.

Third, Stockley focuses on the allegedly malicious preparation of the witness statements which McCormack offered for signature to his interviewees. Plaintiff's Brief at 12–15; Oral Arg. Tr. at 6–14. Noting the absence of the original handwritten notes of McCormack's interviews with Jericho employees, Oral Arg. Tr. at 22, plaintiff attempts to prove that McCormack's typewritten notes were an invention contrived to rationalize, *post hoc*, a decision to discipline Stockley that had already been made despite a lack of evidence against him. A defamation claim based on this alleged contrivance, as discussed above, is barred by the statute of limitations, but Stockley's allegations, if proven, could nonetheless be evidence of malice. The allegations, however, are so unsupported by the evidence of record that no material issue of fact is raised by the McCormack witness statements.

Plaintiff submits an ATTIS memo sent to McCormack by his direct superior, Leland Burris, and dated March 14, 1985, as evidence that the decision to transfer Stockley had been finalized before signed witness statements were obtained. Stockley Aff. Ex. D. In fact, the memo makes it clear that final discipline for Stockley had not yet been determined, Burris Memo ¶¶ 1, 6, 9, 10, 15, as Dahut has attested. Dahut Aff. ¶¶ 7–11; *see also* Stockley Aff. Ex. D, 3/26/85 ATTIS memo ("Signed testimony ... plus E. Stockley's ... statement and his reaction to training will help his supervision to determine the next step; dismissal or retention with final warning."). Plaintiff also notes the urgency in the directive to McCormack to get signed statements, Stockley Aff. Ex. D, and his reluctance to do so, *id.*, 3/26/85 memo from McCormack to Robert St. John, Regional Personnel Director. These documents evince defendant's concern for having adequate documentation of the case against Stockley, and for McCormack's promise of confidentiality to the Jericho interviewees, but they do not remotely support the inference of a malicious smear campaign.

The case might be different if, as plaintiff suggests, all the signed statements contradicted the typewritten notes that McCormack asked the Jericho employees to sign. A careful comparison between the signed statements and the typed notes, however, reveals that any inconsistencies are generally trivial, and the statements as signed still contain more than enough evidence to substantiate the charges and support ATTIS' decision to discipline Stockley.

Plaintiff submits affidavits from three of the interviewees. John Depass, Witness C, states that the typed notes contained "at least four statements which I never had said." Stockley Aff. Ex. B, Depass Aff. ¶ 2. Even assuming, as the Court must in the context of a summary judgment motion, that Depass's memory of his earlier statement is accurate, his affidavit demonstrates imprecise note-taking rather than malice. More importantly, Depass did not deny, when he added to and signed the witness notes or in his affidavit, that he had "[c]omplained that E. Stockley particularly, made frequent comments of a sexual nature to and about the female non-management employees." McCormack Aff. Ex. D, Witness Statement C. What he did deny in his handwritten comments was saying that he was afraid of retaliation from Stockley and Minor—an understandable retraction once the shield of anonymity was removed, considering that Stockley and Minor were his supervisors.

Similarly, Geraldine Quinn's affidavit (also part of Stockley Aff. Ex. B) fails to support plaintiff's theory. Quinn explicitly acknowledges that she told her interviewers that, under ATTIS' broad definition of sexual harassment, some harassment did take place in the Jericho office. Quinn Aff. ¶ 1. Quinn also admits that notes were taken during the original interview, *id.*, that she had made the statements listed on the typewritten notes, *id.* ¶ 2, and that she

was given the opportunity (albeit after she hesitated to sign) to modify her statement, *id.* Her handwritten statement contains no direct evidence of harassment by Stockley, but neither had the typed notes. McCormack Aff. Ex. D, Witness Statement U.

Finally, Lorraine Gettis states that she was "cornered and badgered" by McCormack's staff into signing a typed statement that was misleading. Stockley Aff. Ex. B, Gettis Aff. ¶ 3. Although her affidavit states that she later "insisted my name be removed from that misleading statement," *id.* ¶ 3, the addition to the notes that she signed reads "I don't wish any statements made by me used for any investigation." McCormack Aff. Ex. D, Witness Statement D. This overwhelming fear that she would be quoted for attribution is reflected in her affidavit, ¶¶ 2, 4. Yet even Gettis did not change the typed notes in any material way before she signed them. The statement presented to her read in full:

> Described office climate as sexual bantering all the time. Claims E. Stockley makes overt sexual comments all the time. It's as if he can't say anything unless it has something to do with someone's body or sex life. He can be very offensive if you take him personally or seriously. He had been particularly after a former co-worker, Beth.

Even if feeling "cornered and badgered," Gettis undeniably had an opportunity to alter these notes. She deleted "climate as" and replaced "all the time" with "as commonplace." She also changed "been particularly after" to "dated." The critical paragraph condemning Stockley's behavior was left untouched.

Plaintiff contends that numerous witnesses refused to sign the typed notes, but offers no affidavits from anyone who refused to sign or who witnessed a refusal to sign. McCormack's sworn statement, uncontroverted by any opposing evidence, is that the only unsigned statements are those by employees who had left the Jericho office or were not at work the day McCormack and his staff returned to obtain signatures. McCormack Aff. ¶ 20. This contention is at least partially borne out by the statements themselves. *See, e.g.,* McCormack Aff. Ex. D, Witness Statement B.

Finally, plaintiff contends that those employees who did sign witness statements altered them in ways that exonerated plaintiff. This assertion wilfully misinterprets the statements in a way that no reasonable jury could credit.

Witness E slightly ameliorated the inculpatory implications of the typed statement in a handwritten addendum. But he added a new section, not on the typed statement, that read: "Claims [name deleted] and E. Stockley did not associate well. His verbal usage toward her was often vulgar with sexual overtones."

Witness F, though she defended her office as "friendly," and specified that she was writing at the request of McCormack's staff, signed a new handwritten statement that essentially reaffirmed all the inculpatory evidence that was in the typed notes.

Witness H's amendatory statement reattributed one sexual remark from Stockley to Minor. However, she did not retract assertions that Stockley had inappropriately hugged her in the cafeteria in front of witnesses, that he had once kissed her on the cheek, that he had made a number of sexually oriented comments toward her, and that she knew about Carol Resta's resignation "because Stockley couldn't keep his hands off her."

Witness I's handwritten statement confirmed and elaborated on the typed notes' statement that she had "[w]itnessed incident in cafeteria." Similarly, Witness J elaborated on the typed notes by specifically listing incidents of harassment that her friends had complained about, though she had not observed them, including the kiss on the cheek. "It seems as if anything is acceptable" at the Jericho office, she concluded.

Witness L signed her statement with no material changes. So did Witness N. Witness Y deleted statements that Stockley "harassed all the girls" and "touches all the time," but confirmed that Stockley had been excessively attentive to Resta in training class, had shot rubber bands at her,

and called women "Oooh Baby." And two witnesses (V and X) who, according to the typewritten notes, had "witnessed or experienced no sexual harassment in office," reconfirmed that statement.

Witness K, who had provided no specific evidence of harassment even according to the typed notes, essentially denied the typed notes' assertion that "she suspected something was going on." Witness W, who, according to the typed notes, "knew of rumors" but had "no first hand knowledge," deleted a statement that "Ed was attentive touching girls." These changes, plus the partial retractions of Witnesses Y and H, were the only significant diminutions of the evidence against Stockley in the comparison of the original typed notes to the signed statements. In light of this comparison, it is simply impossible to sustain the contention that the typed notes were malicious, wholesale fabrications and misrepresentations.

Even if the McCormack notes had diverged significantly from the witnesses' statements, they might not have provided evidence of malice. Plaintiff cites cases in which courts concluded that fact issues were raised as to malice where the "official story" given in support of employee discipline differs from other explanations. *Harvey v. Treder*, No. 85–2928, slip op. at 12 (E.D.N.Y. Oct. 27, 1987) [available on WEST-LAW, 1987 WL 47371]; *Konowitz v. Archway School Inc.*, 65 A.D.2d 752, 409 N.Y.S.2d 757, 759 (2d Dept.1978). These cases are inapposite to Stockley's situation; ATTIS has told only one story about his discipline. Considering that there was ample reason for White to discipline Stockley quite apart from McCormack's witness statements, fabrications in the witness statements—even if proven—would not be evidence of malice on the part of White at the April 9 meeting or in preparing the memo to Stockley's file.

Besides the witness statements, White had available to him Resta's letters and Stockley's own admissions. Stockley conceded that he had brushed back Resta's hair, analogized telephone sales to picking up women in bars, used the phrase "Oh Baby" (though he denied *calling* anyone

"Baby"), invited Resta and other trainees out for a drink, and shot rubber bands at Resta. McCormack Aff. Ex. J. Though Stockley denied any intent to harass, the pattern of incidents occuring within a very short time could certainly fall within the definition of sexual harassment under Title VII, EEOC regulations, and case law. *See Meritor, supra;* 29 C.F.R. § 1604.11(a).

To prove "actual malice," plaintiff would have to show that ATTIS acted with "personal spite or ill will, or culpable recklessness or negligence." *Shapiro v. Health Ins. Plan of Greater New York,* 7 N.Y.2d 56, 61, 194 N.Y.S.2d 509, 513, 163 N.E.2d 333, 336 (1959) (quoting *Hoeppner v. Dunkirk Printing Co.,* 254 N.Y. 95, 106, 172 N.E. 139, 142 (1930)). There is no evidence of spite or ill will. Given Stockley's admissions, Resta's letters, and the signed witness statements, there is also no evidence that ATTIS acted with reckless or negligent disregard for the truth of the sexual harassment allegations. Even though the existence of actual malice is normally a question of fact, summary judgment is appropriate where the plaintiff has produced no evidence that could meet his burden of proving malice. *Ashcroft v. Hammond,* 197 N.Y. 488, 495–96, 90 N.E. 1117, 1120 (1910); *Shapiro, supra* (reversing denial of summary judgment in defamation case); *Friedman v. Ergin,* 110 A.D.2d 620, 487 N.Y.S.2d 109 (2d Dept.1985) (same). This is such a case. Whether or not plaintiff was in fact guilty of sexual harassment, he cannot prove that ATTIS' statements of his guilt, or McCormack's interview notes, were maliciously motivated.

## CONCLUSION

Defendant's motion to dismiss pursuant to Rule 12(b)(6) is granted to the extent that plaintiff's claims are predicated on statements made prior to April 8, 1985. With respect to the balance of the plaintiff's claims, defendant's motion for summary judgment is granted. Defendant's request for attorneys' fees is denied.

The Clerk of the Court is directed to enter judgment for defendant, and to tax costs against plaintiff in accordance with

Fed.R.Civ.P. 54(d) and Local Civil Rule 11 of this Court.

SO ORDERED.