**Warren MANNING**

v.

**CIGNA CORPORATION, et al.**

**Civ. No. H–89–469 (AHN).**

United States District Court,
D. Connecticut.

Nov. 19, 1991.

Igor I. Sikorsky, Jr., Igor I. Sikorsky, Jr., P.C., Rocky Hill, CT, for plaintiff.

Timothy F. Woodbridge, Kennedy & Woodbridge, West Hartford, CT, Stephanie A. Middleton, Philadelphia, PA, for defendants.

NEVAS, District Judge.

Absent objection and after review, the Magistrate's Recommended Ruling is approved, adopted and ratified. SO ORDERED.

MARGOLIS, United States Magistrate Judge.

### RECOMMENDED RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Warren Manning was an employee of defendant, Insurance Company of

North America ["defendant" or "INA"],[1] until his termination on February 10, 1989. He originally commenced this lawsuit in the Connecticut Superior Court in Hartford with an eight-count complaint, dated June 26, 1989, which included claims for breach of an implied employment contract, termination in a manner violative of public policy, negligent misrepresentation, and defamation. On July 26, 1989, defendant removed the action to federal court. (Dkt. # 1).[2]

After some discovery had been conducted, on August 7, 1990, defendant filed its motion for summary judgment, brief in support, and Local Rule 9(c)(1) Statement of Undisputed Facts ["Defendant's Statement"], with multiple exhibits.[3] (Dkt. ## 13–17). On October 18, 1990, plaintiff filed his brief in opposition and Local Rule 9(c)(2) Statement of Disputed Facts ["Plaintiff's Statement"], with exhibits.[4] (Dkt. # 20). On November 16, 1990 defendant filed a reply brief. (Dkt. # 22).

For the reasons stated herein, defendant's motion is granted in full.

**1.** See note 2 infra.

**2.** The sole defendant named by plaintiff in his state court complaint was CIGNA Corporation. Attached to the petition for removal was an affidavit from Harry E. Hoyt, Vice President and Corporate Secretary of CIGNA Property and Casualty Insurance Company, in which Hoyt asserted that through a series of transactions all employees of CIGNA Property and Casualty Insurance Company (formerly Aetna Insurance Company) became employees of INA.

As these corporate transactions are not disputed by plaintiff and are not at issue in this case, for convenience purposes the defendant will be referred to solely as INA.

**3.** The exhibits to Defendant's Statement (Dkt. # 15) included: excerpts from CIGNA's "Handbook of Policies, Programs and Services for Employees" ["HPPSE"] and excerpts from "Property & Casualty Group Personnel Policies and Programs Manual" ["PPPM"] (Exh. A); copies of unsworn CIGNA/INA employee statements from ten female employees, including Wendy Mongeon (Exh. B); and copy of unsworn statement from Kathleen Brown (Exh. C). Two deposition transcripts also were submitted, those of Katherine Okumura ["Okumura Tr."] and of plaintiff ["Manning Tr."], both taken on November 16, 1989. (Dkt. ## 16–17).

**4.** These exhibits included: excerpts from plaintiff's deposition (Exh. A); unsigned affidavit

## I. FACTUAL BACKGROUND

The following facts apparently are not in dispute:[5] Prior to February 10, 1989, plaintiff was employed as a unit claim manager, after having been employed by INA, CIGNA and the Aetna Insurance Company for approximately nineteen years.[6] (Defendant's Statement ¶ 4; Manning Tr. at 14–15, 61). On February 1, 1989, plaintiff's supervisor, Kathleen Brown, Vice President Claims, received a complaint from a receptionist that plaintiff repeatedly had reached towards her chest while she was working and that on previous occasions plaintiff had run his fingers under her skirt and up her thigh and had made unwelcome and inappropriate comments to her; Brown, in turn, notified Wendy Mongeon, Human Resources Manager, of these allegations. (Defendant's Statement ¶ 5; Defendant's Exhs. B–C).[7]

Later that day or the next day, Brown informed plaintiff that allegations of sexual harassment had been made against him, and she advised him to remain at home pending an investigation by the Employee

from plaintiff (Exh. B); and excerpts from Aetna/CIGNA's "Corporate Personnel Reference, Policies, Guidelines and Procedures" ["PGP"], a page from an unidentified handbook ["Handbook"], and similar excerpts from defendant's PPPM (Exh. C).

**5.** Plaintiff's Statement, which is nine paragraphs long and makes reference to plaintiff's deposition or unsigned affidavit, largely does not dispute the statements made in Defendant's Statement. As the Second Circuit held earlier this year, "The rule is well-settled in this circuit that a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." Trans–Orient Marine Corp. v. Star Trading & Marine, Inc., 925 F.2d 566, 572–73 (2d Cir.1991) (citations omitted). See also Hall v. Louis, Civ. No. N89–128(AHN) (D.Conn. Aug. 21, 1990), slip op. at 2 (same).

**6.** It is not clear whether plaintiff received an employee handbook or manual at the time he was hired, or at any time thereafter. (Manning Tr. at 16–18, 47, 111–12).

**7.** At his deposition, plaintiff claimed that he had been pointing at some jewelry around the receptionist's neck. (Manning Tr. at 86–89).

Relations department. (Defendant's Statement ¶ 6; Defendant's Exh. C; Manning Tr. at 87, 89–90). This investigation uncovered complaints from several female employees that plaintiff repeatedly touched or approached them in an offensive and unwelcome manner, including placing his hand down their blouses, touching the buttons or pockets on the front of their blouses, touching their hips, arms, shoulders, and/or waists, asking a female intern to sit on his lap and then blowing on her neck, and inquiring about their sexual activities with their husbands or boyfriends. (Defendant's Statement ¶¶ 7–11, 21–22; Defendant's Exhs. B–C; Okumura Tr. at 5–8, 9, 10–13, 17–23, 42).[8] Plaintiff had been warned by several supervisors, including Brown, and by numerous female employees, that his conduct was offensive and was not acceptable. (Defendant's Statement ¶¶ 12–20; Defendant's Exhs. B–C; Okumura Tr. at 7, 22–23, 26–29, 41–42).[9]

On February 10, 1989, plaintiff attended a meeting, at which he was terminated by Brown, with the approval of her supervisor. (Defendant's Statement ¶ 24; Defendant's Exh. B; Manning Tr. at 93–94, 108–09). Plaintiff contends that Brown failed to provide him with specific details of the investigation, nor did she give him an opportunity to defend himself. (Plaintiff's Statement ¶¶ 6–7; Manning Tr. at 95–96). Other INA employees became aware that plaintiff was terminated because of complaints of sexual harassment, but the parties differ somewhat as to who was the primary source of such information. (Plaintiff's Statement ¶ 25; Defendant's Statement ¶ 8; Okumura Tr. at 13–14; Manning Tr. at 119–26).

## II. DISCUSSION

█ F.R.Civ.P. 56(c) provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(e) adds:

> When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

In *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986), now Chief Justice Rehnquist characterized the summary judgment procedure "not as a disfavored procedural shortcut but rather as an integral part of the Federal Rules as a whole ..." Justice Rehnquist continued:

> Rule 56 must be construed with due regard not only for the rights of persons asserting claims and defenses that are adequately based in fact to have those claims and defenses tried to a jury, but also for the rights of persons opposing such claims and defenses to demonstrate in the manner provided by the Rule, prior to trial, that the claims and defenses have no factual basis.

*Id.* As Justice Rehnquist observed, a party opposing summary judgment may rely upon any of the evidentiary materials listed in Rule 56(c), except the mere pleadings themselves. *Id.* at 324, 106 S.Ct. at 2553. In considering a motion for summary judgment, the court's responsibility is not to resolve disputed issues of fact but to assess whether there are any factual issues to be tried, while resolving ambiguities and drawing reasonable inferences against the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50, 106 S.Ct. 2505, 2510–11, 91 L.Ed.2d 202 (1986); *Knight v. United States Fire Ins. Co.*, 804

---

**8.** At his deposition, plaintiff did not deny these allegations; he simply did not recall them or had a somewhat more sanitized recollection of them, attributing the incidents to Manning's generally friendly nature. (Manning Tr. at 65–73, 75–89, 92, 96–104, 106–07, 133–37).

**9.** In ¶ 4 of Plaintiff's Statement, plaintiff denies that he had been given such warnings. However, at his deposition, plaintiff acknowledged having received many of these warnings. (Manning Tr. at 73–76, 78–79, 96–104, 112–13). *See* note 5 *supra*.

F.2d 9, 11 (2d Cir.1986), *cert. denied,* 480 U.S. 932, 107 S.Ct. 1570, 94 L.Ed.2d 762 (1987). In *Anderson,* the Court held that the standard under Rule 56 "mirrors" that "for a directed verdict under ... Rule 50(a), which is that the trial judge must direct a verdict if, under the governing law, there can be but one conclusion as to the verdict." 477 U.S. at 250, 106 S.Ct. at 2511 (citations omitted).

In *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986), Justice Powell noted that "if the factual context renders respondents' claim implausible— ...—respondents must come forward with more persuasive evidence to support their claim than would otherwise be necessary." Rather than resting upon "mere conclusory allegations or denials as a vehicle for obtaining a trial," the non-moving party "must bring to the district court's attention some affirmative indication that his version of relevant events is not fanciful." *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980).

■ The general rule in Connecticut is that "an employment agreement of indefinite duration is terminable at the will of either the employee or the employer." *Orton v. Schlumberger Technology Corp.,* Civ. No. B88–202(TFGD) (D.Conn. June 11, 1990), slip op. at 7 (*citing D'Ulisse–Cupo v. Board of Directors of Notre Dame High School,* 202 Conn. 206, 211 n. 1, 520 A.2d 217 (1987)). However, as Judge Dorsey recently analyzed in *Kelsey v. Sheraton Corp.,* 662 F.Supp. 10, 13 (D.Conn.1986):

> Recent Connecticut caselaw appears to provide three theories on which a plaintiff may be able to avoid this result in appropriate cases: 1) proof that what appears to be an at-will employment contract is not actually terminable at will because of contract terms which can be implied from the dealings between the parties ...; 2) an action for breach of an implied covenant of good faith and fair dealing found in the employment contract, even if at-will ...; and 3) an action

in tort for wrongful discharge in violation of an important public policy. (citations omitted). Plaintiff seeks to avail himself of all three of these exceptions.

## A. BREACH OF EMPLOYMENT CONTRACT CLAIMS (FIRST AND SECOND COUNTS)

■ The first two counts of plaintiff's complaint are for breach of contract claims arising out of various employment manuals. In 1987, the Connecticut Supreme Court held that under appropriate circumstances, representations made in an employer's personnel manual "may give rise to an express or implied contract between employer and employee." *Finley v. Aetna Life & Cas. Co.,* 202 Conn. 190, 198, 520 A.2d 208 (1987). The Connecticut Supreme Court further held that in the absence of definitive contractual language, the question of whether the parties intended an employment manual to constitute part of their contract is a question of fact to be determined by the trier of fact. *Carbone v. Atlantic Richfield Co.,* 204 Conn. 460, 471–72, 528 A.2d 1137 (1987); *Finley, supra,* 202 Conn. at 199, 520 A.2d 208. However, as Judge Cabranes observed in *Owens v. American National Red Cross,* 673 F.Supp. 1156, 1165 (D.Conn.1987):

> [E]ven after *Finley,* it is clear that the existence of a personnel manual claimed to create a contractual relationship does not automatically create a question of fact which precludes summary judgment. In this case the threshold question is whether, interpreting all inferences in a light most favorable to plaintiff, the manuals issued by [the defendant-employer] could be found to give rise to an enforceable contract. On a motion for summary judgment, this is a question of law for the court.

(*citing Finley, supra,* 202 Conn. at 199 n. 5, 520 A.2d 208). Thus, the judges in this district have not hesitated to grant a defendant-employer's motion for summary judgment on such claims in the appropriate circumstances. *See, e.g., Beckerman v. Metallgesellschaft Services, Inc.,* Civ. No. B89–244(TFGD) (D.Conn. July 12, 1990), slip op. at 8 (as plaintiff previously was

unaware of the contents of the employment manual at issue, he cannot claim to have relied upon it); *Raimondo v. Amax, Inc.,* Civ. No. B88–163(WWE) (D.Conn. Mar. 9, 1990), slip op. at 8–10 (manual had been distributed to senior members of management only and was for the purpose of providing guidance, rather than mandatory directives); *Nickse v. Hertz Corp.,* Civ. No. B88–135(TFGD) (D.Conn. May 4, 1989), slip op. at 4–5 (plaintiff had not seen personnel manual, nor had he relied upon it, at any time prior to termination); *Pecha v. Stauffer Chemical Co.,* Civ. No. B87–694(WWE) (D.Conn. Mar. 1, 1989), slip op. at 8–9 (plaintiff had only vague knowledge of any terms in any employment manual or personnel policy of defendant); *Barclay v. Hospital of St. Raphael,* Civ. No. N87–20(AHN) (D.Conn. Aug. 12, 1988), slip op. at 7–11 (hospital's personnel manual only applied to managerial employees and plaintiff was not even aware of the allegedly applicable provisions until after she was denied a promotion); *Sivell v. Conwed Corp.,* 666 F.Supp. 23, 26–27 (D.Conn.1987) (personnel manual was distributed only to management personnel and established only guidelines, not mandatory directives). *But see Strautman v. UNC Inc.,* Civ. No. H87–798(PCD) (D.Conn. Mar. 6, 1990) (ruling in motion in limine after denial of defendant-employer's motion for summary judgment that plaintiff was permitted to introduce manual as evidence of defendant's contractual intent, while defendant was allowed to introduce evidence as to the limited applicability of same).

In his first two counts, plaintiff relies upon various provisions in the PPPM, PGP, and Handbook that defendant is to provide "continuous and secure employment" and that an employee is to be terminated only after having been given an opportunity to take corrective measures.[10] For example, the PGP and Handbook ¶ 3 both provide that it is "[C]orporate policy ... to provide continuous and secure employment to those full-time salaried employees whose performance meets the standards established for their jobs."

Both parties have appended excerpts from the PPPM, which sets forth in considerable detail defendant's policy statement against sexual harassment, a comprehensive definition of sexual harassment, defendant's responsibilities once sexual harassment has been brought to its attention, and disciplinary measures which may be brought against an employee. The "Policy Statement" provides that it is the company's

policy to assure an environment free of all forms of discrimination, including sexual harassment. Sexual harassment will not be tolerated. [Defendant] will investigate any issue as it arises and will take appropriate disciplinary action, up to and including termination of employment.

(PPPM at ER4). Examples of sexual harassment include "[m]aking offensive remarks, including unwelcome comments about appearance, or telling obscene jokes" and "[t]ouching another person in an unwelcome fashion." (*Id.*) After an incident of sexual harassment has been reported, an investigation is to be commenced. (*Id.* at ER4.1). Disciplinary action "may range from a written warning up to termination of employment, depending on the seriousness of the case." (*Id.*) Among the actions which "can result in immediate termination" are

Harassment including:

—continuing to make sexual advances to another employee after being instructed by a supervisor, in response to an employee complaint, to cease such actions;

—continuing to make derogatory remarks or take inappropriate actions based on an employee's sex ... after being instructed by a supervisor, in response to an employee complaint, to cease such actions.

Any employee accused of harassment by another employee where no supporting evidence exists should be warned that such actions are grounds for dismissal. If repeated employee complaints and

---

**10.** The specific provision quoted in ¶ 11 of the First Count is not found within the excerpts attached as plaintiff's Exh. C. *See* note 4 *supra.*

evaluation of the incidents indicate that harassment is continuing, the accused employee may be dismissed.

(*Id.* at RD4.2–RD4.3). The PPPM further provided: "Before the dismissal action is effected, the employee should be given an opportunity to discuss circumstances surrounding the action with the supervisor." (*Id.* at RD4.4).

However, as the Connecticut Supreme Court acknowledged in *Finley, supra,* "[B]y including appropriate disclaimers of the intention to contract, employers can protect themselves against employee contract claims based on statements made in personnel manuals." 202 Conn. at 199 n. 5, 520 A.2d 208. *See also Holze v. Branson Ultrasonics Corp.,* Civ. No. B90–107 (TFGD) (D.Conn. June 5, 1991, Magistrate Judge's ruling approved July 29, 1991), slip op. at 13–14 (as defendant-employer's handbook contained disclaimers, it could not be relied on as a basis for a contractual claim); *Haley v. Tandy Corp.,* Civ. No. H88–434(PCD) (D.Conn. Apr. 10, 1990), slip op. at 15–16 (same); *Viggiano v. Town of Redding,* Civ. No. B89–540(WWE) (D.Conn. Mar. 27, 1990), slip op. at 4 (same). Such is the case here, where the HPPSE explicitly provides:

> This handbook is for information only. It is not an employment contract. It is a statement of current policies, practices and procedures. CIGNA reserves the right to change any or all such policies, practices and procedures in whole or in part at any time, with or without notice to you.
>
> Nothing in this handbook and nothing otherwise communicated to you about your rights as an employee, regardless of the source, limit in any way ... your employer's right to terminate your employment at any time for any reason.

■ Thus, as in *Haley* and *Viggiano,* defendant's comprehensive disclaimer precludes plaintiff's first two counts. Even if the disclaimer is not operative and defendant is bound by these various provisions, such provisions have been met, as plaintiff acknowledged that he had received prior warnings from several supervisors that his

conduct was offensive and was not acceptable.[11] Therefore, summary judgment is appropriate on plaintiff's First and Second Counts.

## B. IMPLIED CONTRACT (THIRD COUNT)

■ In this Third Count, plaintiff alleges that defendant's written policies and verbal assurances "created an implied contract of continued employment so long as Manning's performance met the standards established for his job." (¶ 11). In Connecticut, an implied employment contract may arise under the doctrine of promissory estoppel, where injustice to a promisee who has acted in reliance can be avoided only by enforcement of "a clear and definite promise which a promisor could reasonably have expected to induce reliance." *D'Ulisse–Cupo, supra,* 202 Conn. at 213, 520 A.2d 217. To prevail on such a claim, a plaintiff must prove by a fair preponderance of the evidence that his or her employer " 'agreed, either by words or action or conduct to undertake [some] form of actual contract commitment' to him under which he could not be terminated without just cause." *Coelho v. Posi–Seal Int'l, Inc.,* 208 Conn. 106, 112, 544 A.2d 170 (1988) (citations omitted). The *Coelho* decision further held:

> Absent a statutory warranty or definitive contract language, the determination of what the parties intended to encompass in their contractual commitments is a question of the intention of the parties, and an inference of fact.... This process of inference is peculiarly a jury function, the raison d'etre of the jury system.

208 Conn. at 113, 544 A.2d 170 (citations omitted).

A similar approach has been taken in federal courts, where the courts generally do not take this issue away from the trier of fact if there is a dispute as to the existence and terms of an implied employment contract:

> [I]n cases involving implied employment contracts, the terms of which must be gleaned from employment manuals, com-

---

11. *See* note 9 *supra* and accompanying text.

pany memoranda, and the "totality of the employment relationship", [sic] such definitive contract language is obviously lacking, and the intent of the parties remains a question of fact to be determined by the jury.

*Heller v. Champion International Corp.*, 891 F.2d 432, 435 (2d Cir.1989) (reversing granting of judgment n.o.v. in favor of defendant-employer in an action for breach of implied employment contract). *See also Orton, supra,* slip op. at 7–12 (summary judgment denied where defendant-employer's statements alleged by plaintiff-employee to create an implied employment contract were "sufficiently definite and ... so 'contractually loaded' that the true measure of the parties' intentions as to the scope of their contractual commitments, whether express or implied, [became] an inference of fact best left for trial"); *Nickse, supra,* slip op. at 5–7 (summary judgment denied for same reason).

At his deposition, plaintiff testified that he was unaware of defendant's termination policies during his tenure, but that based upon his long tenure with defendant, he believed that an employee could not be terminated without being told the reason therefor and given an opportunity to respond. (Manning Tr. at 53–55, 113–14). He further added that he had never seen anyone discharged in the manner in which he was discharged. (*Id.* at 114–16). This evidence differs sharply from the allegations of *specific* promises made by the defendants-employers in *Coelho, Orton,* and *Nickse.* More apropos to this case is *Anderson v. Coca Cola Bottling Co. of New York,* 772 F.Supp. 77, 84 (D.Conn. 1991), and *Caliendo v. Kango–Tools, Inc.,* Civ. No. B89–257(TFGD) (D.Conn. June 11, 1990), slip op. at 6–7, where summary judgment for the defendant-employer was granted, as the plaintiff-employee could cite no evidence to support his unilateral understanding of an implied employment contract on the issue of discharge. *See also Johnson v. Carpenter Technology Corp.,* 723 F.Supp. 180, 182–83 (D.Conn. 1989) (defendant's statement eighteen years prior to plaintiff's termination that it "takes care of its own, viewed in isolation, is insufficiently definite and promissory to

form the basis for a ... promissory estoppel claim") (dicta); *Christensen v. BIC Corp.,* 18 Conn.App. 451, 454–58, 558 A.2d 273 (1989) (plaintiff-employee presented no evidence to show that defendant-employer, either by its words or by its conduct, entered into an implied contract to pay him a bonus after his termination, and plaintiff's belief that such a contract existed did not bind defendant absent evidence of its intent to be bound).

Thus, summary judgment for defendant is appropriate with respect to the Third Count.

## C. BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING (FOURTH AND EIGHTH COUNTS)

Plaintiff's Fourth and Eighth Counts allege that defendant breached the implied covenant of good faith and fair dealing by terminating him in a manner which violated public policy. The implied covenant of good faith and fair dealing has its genesis in the Connecticut Supreme Court's decision in *Sheets v. Teddy's Frosted Foods, Inc.,* 179 Conn. 471, 475, 427 A.2d 385 (1980), which recognized a cognizable action "[i]f the former employee can prove a demonstrably *improper* reason for dismissal, a reason whose impropriety is derived from some important violation of public policy." Such a cause of action is "an exception to the general rule that an employee at will may be dismissed without good cause ... [which] protects employee job security from employer actions that contravene public policy." *Orton, supra,* slip op. at 13. However, the Connecticut Supreme Court has "expressly refused to enlarge the circumstances under which an employee at will may successfully challenge his dismissal beyond the situation where the reason for discharge involves impropriety derived from some important violation of a public policy." *Morris v. Hartford Courant Co.,* 200 Conn. 676, 679 n. 2, 513 A.2d 66 (1986). The court concluded that a discharge based upon a false but negligently made accusation of criminal conduct was not an improper reason for dismissal nor was it derived from an impor-

tant violation of public policy. *Id.* at 680, 513 A.2d 66.

In light of the admonition expressed in *Morris* and other Connecticut Supreme Court cases, the federal judges in this district frequently have granted a defendant-employer's motion for summary judgment where the plaintiff-employee has failed to submit any evidence that the discharge was for some "demonstrably improper reason ... whose impropriety is derived from some important violation of public policy." *See, e.g., Anderson, supra,* 772 F.Supp. at 84; *Kempf v. GFV Communications, Inc.,* Civ. No. B87–847(TFGD) (D.Conn. Sept. 25, 1990), slip op. at 7–10; *Beckerman, supra,* slip op. at 8–9; *Orton, supra,* slip op. at 12–15; *Nickse, supra,* slip op. at 7–8. In *Beaulac v. Cheshire Academy,* Civ. No. N88–361 (PCD) (D.Conn. June 5, 1989), slip op. at 12–13, the defendant-employer's motion for summary judgment was denied, as plaintiff has submitted sufficient evidence with respect to his claim that defendant had retaliated against him, in violation of public policy, for plaintiff having filed a complaint with the Connecticut Commission on Human Rights and Opportunities.

The facts here are far more analogous to those in *Anderson, Kempf, Beckerman, Orton,* and *Nickse,* than to the "demonstrably improper" situation presented in *Beaulac.* Therefore, summary judgment is granted for defendant with respect to the Fourth and Eighth Counts.

### D. MISREPRESENTATION (FIFTH COUNT)

■ Plaintiff's Fifth Count is for negligent misrepresentation. In *D'Ulisse–Cupo, supra,* the Connecticut Supreme Court adopted the principles in § 552 of the Restatement (Second) of Torts that:

> One who, in the course of his business, profession or employment ... supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

202 Conn. at 217–18, 520 A.2d at 223. The Connecticut Supreme Court reaffirmed that "even an innocent misrepresentation of fact 'may be actionable if the declarant has the means of knowing, ought to know, or has the duty of knowing the truth.'" 202 Conn. at 217, 520 A.2d at 223 (citations omitted). In *D'Ulisse–Cupo,* the plaintiff-teacher complained that her defendants-employers had made unconditional representations of their plans to rehire her, when they knew or should have known such rehiring was contingent upon student enrollment levels for the following year. *Id.* at 218, 520 A.2d at 223.

A defendant-employer's motion for summary judgment for negligent misrepresentation has been denied when the plaintiff-employee has come forward with evidence substantiating the elements of his claim. *See, e.g., Haley, supra,* slip op. at 18–19; *Beaulac, supra,* slip op. at 10–11; *Nickse, supra,* slip op. at 9–10. Plaintiff cites defendant's various manuals as the source of misrepresentations regarding job security. Even beyond the vagueness of these policy statements, their context, and the explicit disclaimer, *see* Section II.A. *supra,* plaintiff consistently testified that he was generally unaware of INA's written policies and more specifically could not refer to any written policies guaranteeing ongoing employment or termination only for failure to meet job requirements. (Manning Tr. at 52–55, 114–18). Plaintiff accordingly cannot argue that he relied upon these alleged misrepresentations to his detriment. Thus, this case is more analogous to *Caliendo, supra,* slip op. at 9–10, where the defendant-employer's motion for summary judgment was granted on this claim, as there had been no discussion between the parties with respect to this issue. *Cf. McGeehan v. Blue Circle Atlantic, Inc.,* Civ. No. B87–830(TFGD) (D.Conn. Mar. 30, 1990), slip op. at 5–9 (plaintiff-employee's claim for negligent misrepresentation barred where plaintiff had a comprehensive written employment contract with the defendant-employer, which contract contained a merger clause).

### E. DEFAMATION (SIXTH AND SEVENTH COUNTS)

■ In his Sixth Count, while recognizing that defendant has a qualified privi-

lege, plaintiff alleges that such privilege was abused when INA informed various employees, directly or indirectly, that Manning had sexually harassed another INA employee. The Seventh Count alleges that plaintiff has been compelled to disclose the circumstances of his discharge to other prospective employers and professional associates.

Judge Nevas just last month summarized the Connecticut law for defamation claims as follows:

> Before a party will be held liable for defamation under Connecticut law, there must be an unprivileged publication of a false and defamatory statement.... The plaintiff must prove as an essential element in a defamation action that a defendant published an actionable and false, defamatory statement.... An individual not responsible for the contents, publication, or dissemination of the alleged defamatory material is not a proper defendant in a defamation action....

*Gauvin v. State of Connecticut, Dept. of Special Revenue,* Civ. No. H88–45(AHN), 1991 WL 441897 (D.Conn. Sept. 24, 1991), slip op. at 5 (footnote & multiple citations omitted). Judge Nevas in *Gauvin* granted a partial summary judgment where six employees of a private company had not authored, published, or disseminated the allegedly defamatory report investigating plaintiff's alleged improprieties. *Id.* at 5–8.

At his deposition, plaintiff testified that several of defendant's employees were aware that he had been terminated for sexual harassment, although he did not know the specifics of their knowledge and how such knowledge was gained, and that one particular employee had disclosed this information to another employee. (Manning Tr. at 119–26). However, he did concede that he acknowledged to other employees that he had been terminated and that his wife disclosed to at least one INA employee the reason therefor. (*Id.*).

Whether a defamatory communication implicates an interest sufficient to establish a qualified privilege is a question of law. *Bleich v. Ortiz,* 196 Conn. 498, 501, 493 A.2d 236 (1985); *Charles Parker Co. v. Silver City Crystal Co.,* 142 Conn. 605, 615, 116 A.2d 440 (1955) [*"Parker"*]. In

order to establish this privilege, a defendant must assert an "objective interest sufficiently compelling to warrant protection of an otherwise defamatory communication." *Bleich, supra,* 196 Conn. at 501, 493 A.2d 236. Furthermore, the statement must be limited to protecting that interest, made in good faith and on a proper occasion, published in a proper manner to appropriate parties, and must not be activated by malice, improper motive, or lack of good faith in making the statement. *Miles v. Perry,* 11 Conn.App. 584, 595, 529 A.2d 199 (1987) (*citing Parker, supra,* 142 Conn. at 615, 116 A.2d 440).

In circumstances nearly identical to those presented here, two federal courts have ruled in favor of the defendant-employer confronted with a defamation claim brought by a former employee who had been terminated on account of sex harassment. In *Garziano v. E.I. Du Pont de Nemours & Co.,* 818 F.2d 380 (5th Cir. 1987), a female employee quit her job after her male supervisor had sexually harassed her on two occasions; she disclosed these events in her exit interview. Du Pont immediately began an investigation, resulting in plaintiff Garziano's termination, which "caused a number of rumors to circulate" at the plant. *Id.* at 383. Partly in response to employee inquiries, Du Pont circulated a bulletin condemning sexual harassment, the introductory paragraph of which read:

> The recent sexual harassment incident which resulted in an employee's termination has raised supervisory and employee questions about the subject. This particular incident was determined to be a serious act of employee misconduct, but in deference to the employees involved cannot be discussed in detail. However, deliberate, repeated, and unsolicited physical contact as well as significant verbal abuse was involved in this case.

*Id.* at 383–84. A jury rendered a verdict in favor of plaintiff on his defamation claim, under Mississippi law. In reversing the verdict and remanding it for retrial, the Fifth Circuit had no difficulty in finding

that the bulletin was a privileged communication:

> Du Pont's communication to its employees ... was issued on an occasion of qualified privilege. Co-workers have a legitimate interest in the reasons a fellow employee was discharged.... Du Pont's Employee Handbook explicitly condemned sexual harassment at the plant. Moreover, federal law imposes a specific duty upon employers to protect the workplace and the workers from sexual harassment, including redressing known occurrences of sexual harassment.
>
>     \*      \*      \*      \*      \*      \*
>
> We hold that Du Pont issued the management information bulletin on an occasion of qualified privilege because: 1) Du Pont believed it had a legal duty to do so; 2) the bulletin was necessary to inform employees of Du Pont's policy against sexual harassment; and 3) employers are protected in communicating on matters of "common interest" with employees. The facts essential to the creation of a qualified privilege stand uncontroverted. Therefore, a qualified privilege should have been recognized as a matter of law.

*Id.* at 387–88 (footnotes & multiple citations omitted). In light of plaintiff's testimony that he generally "got along with his superiors," and only had one prior dispute with defendant over denial of a request for sick leave, the appellate court found no evidence of bad faith or malice on Du Pont's part. *Id.* at 390–91. The court further held that as Du Pont had utilized the "most restrictive means of written communication to inform the supervisors of Garziano's discharge," there had been no abuse of the privilege. *Id.* at 391–94.

The same conclusion was reached, under New York law, in *Stockley v. AT & T Information Systems, Inc.,* 687 F.Supp. 764 (E.D.N.Y.1988), where the district court granted the defendant-employer's motion for summary judgment. In *Stockley,* an anonymous letter triggered a comprehensive investigation into allegations of sexual harassment at ATTIS, ultimately resulting in Stockley's termination. Like plaintiff here, Stockley's evidence that ATTIS' publication went outside the scope of the qualified privilege was superficial, at least:

> What is striking about all these affidavits is that they nowhere link any of the office gossip about Stockley to ... any ... ATTIS executive involved in the Title VII investigation or in the imposition of discipline on Stockley. All the affidavits prove is that the harassment case was no secret. But that is hardly surprising. [The complaining female employee] had made her complaints widely known before ... [the] investigation even began.... Stockley and his supervisor ... had both heard about them.... Moreover, the ... interviews—which themselves are not alleged to have included any defamatory statement ...—were bound to set the office abuzz, as one of the plaintiff's affiants avers.... Proof of a "grapevine" is not proof of unprivileged communications by ATTIS executives. Rather, the proof adduced by plaintiff supports the inference that rumors about Stockley were spread from all possible sources *but* the ATTIS executives involved in his case.... Moreover, even if ATTIS told Stockley's coworkers the reasons for his transfer, such communications—including, incidentally, the ... interview notes—would also have been privileged, because made in good faith in furtherance of Title VII and the company's written policy against sexual harassment....

*Id.* at 771 (multiple citations omitted).

The same result should be reached here. Plaintiff's evidence in opposition to defendant's summary judgment motion is, if anything, even more inconclusive that the affidavits submitted in *Stockley.* To the extent there was office gossip with respect to plaintiff's termination, it is impossible to ascertain that INA managerial employees were the source of that information, as opposed to the ten women who had submitted statements regarding Manning. In fact, Manning conceded at his deposition that he had discussed the fact of his termination with other INA employees, and that his wife had revealed the reason therefor to other INA employees. Also, as in *Garziano,* there was no evidence whatsoever

as to any bad faith or malice on defendant's part. For these same reasons, there is no basis to plaintiff's claims of self-publication in his Seventh Count.[12]

### III.  CONCLUSION

For the reasons stated above, defendant's motion for summary judgment is granted in full.

*See* 28 U.S.C. § 636(b) (written objections to ruling must be filed within ten days after service of same); F.R.Civ.P. 6(a), 6(e) & 72; Rule 2 of the Local Rules for United States Magistrates, United States District Court for the District of Connecticut; *Small v. Secretary, H & HS*, 892 F.2d 15, 16 (2d Cir.1989) (failure to file timely objection to Magistrate Judge's recommended ruling may preclude further appeal to Second Circuit).

Dated at New Haven, Connecticut, this 24th day of October, 1991.

---

**12.**  In light of this conclusion, there is no need to address the narrow exception in the specific context of employer-employee relations to the general rule that publication of a defamatory statement to a third party by the individual defamed is not actionable. *See, e.g., McKinney v. County of Santa Clara,* 110 Cal.App.3d 787, 795–98, 168 Cal.Rptr. 89 (1980); *Lewis v. Equitable Life Assurance Society,* 389 N.W.2d 876, 886–88 (Minn.1986).