United States Court of Appeals,

Fifth Circuit.

No. 92-7522.

ESMARK APPAREL, INC., Plaintiff-Appellant/Cross-Appellee,

v.

Thomas JAMES et al., Defendants,

Thomas James, Defendant-Appellee/Cross-Appellant.

Jan. 10, 1994.

Appeals from the United States District Court for the Northern District of Mississippi.

Before GARWOOD, DAVIS and SMITH, Circuit Judges.

W. EUGENE DAVIS, Circuit Judge:

Esmark Apparel, Inc. sued a group of former employees alleging that they conspired to convert company property and to misappropriate company funds. One of the employees, Thomas James, counterclaimed alleging that he was defamed when the company announced to his co-workers that he had been fired for his involvement in the conspiracy. The district court dismissed both the original claim and the counterclaim on cross-motions for summary judgment, and both parties now appeal. Based on our review of the record, we affirm both grants of summary judgment.

I.

Esmark Apparel, Inc. ("Esmark") is a manufacturer and distributor of women's hosiery. The company, headquartered in New York, has a distribution center in Memphis, Tennessee and a manufacturing plant in Grenada, Mississippi. Thomas James was employed at the Grenada plant from 1951 until 1989, where he was in charge of various aspects of production and inventory control.

During the time period at issue, Robert Tadin, a co-defendant in this case, worked in Esmark's Memphis office. When the Memphis office received an order, Tadin would instruct James in Grenada to prepare the hosiery for delivery. Ordinarily, Tadin transmitted the orders to Grenada via computer, and based on the computer record, the Memphis office would issue an invoice to the customer. On occasion, however, Tadin would send a "manual" order to Grenada by telephone or by mail, and

James would send an inter-office memorandum to Memphis from which an invoice would be generated and mailed to the customer.

At the end of 1987, Van Hawthorne, Esmark's chief accountant in Grenada, discovered a discrepancy between the company's book inventory and its physical inventory. In investigating the discrepancy, Hawthorne discovered that for certain "manual" orders filled by the Grenada plant, Esmark had failed to generate invoices and therefore had not been paid. Hawthorne informed Bill Craig, the executive in charge of the Grenada operation, about these unpaid orders.

By cross-referencing some of James' inter-office memoranda with the company's invoice records, Esmark discovered that the unpaid orders had been filled for Dooksie "D.L." Maynard, a regular purchaser of hosiery from the Grenada plant. Knowing that Tadin had handled these orders, Craig questioned him about the problem. Tadin confessed that he had intercepted James' memoranda and kept Maynard's cash payments for these orders. Tadin was subsequently discharged. Although Tadin insisted that no other Esmark employees were involved in the scheme, the company continued to investigate to determine whether other employees might be implicated.

In June 1989, Esmark sued Tadin, Maynard, and several "Does." In its complaint, Esmark asserted causes of action for common law conspiracy, conversion, fraud, and breach of the duty of loyalty, as well as RICO claims under 18 U.S.C. § 1962(a)-(d). Esmark based its allegations on the defendants' suspected involvement in a scheme to convert company property and to misappropriate company funds.

Following further internal investigation, Esmark decided to fire James for his participation in the alleged scheme. In December 1989, Craig travelled to Grenada, where he informed James that he was being terminated for his role in the alleged conspiracy and escorted him off the premises. Craig then assembled the plant's management-level employees and announced that James had been dismissed for his involvement in a scheme to misappropriate company funds. In February 1990, Esmark amended its complaint to name James as a co-defendant in its suit against Tadin and Maynard. In his answer, James asserted a counterclaim against Esmark for defamation based on Craig's statement to the Grenada employees.

Following discovery, both parties moved for summary judgment on the claims against them. In a memorandum opinion, the district court granted both parties' motions and dismissed the case. The court concluded that although Esmark's evidence showed that James was "in a position" to participate in the misappropriation of Esmark funds, a rational jury could not find that he took part in such activity. With respect to James' defamation claim, the court concluded that since Craig's statement was made only to management-level employees and was limited to the circumstances of their co-worker's dismissal, the "occasion" of the alleged defamatory statement was qualifiedly privileged. The court also concluded that James had failed to overcome Esmark's qualified privilege by establishing either excessive publication or actual malice on the part of the company.

Esmark subsequently filed a motion to alter or amend the judgment, and James responded by filing a motion for sanctions and attorneys' fees. The district court, however, denied both motions. Esmark then filed its notice of appeal, and James filed his notice of cross-appeal.

## II.

## A.

We review a grant of summary judgment de novo, applying the same standard of review as the district court. See *Jackson v. Federal Deposit Ins. Corp.,* 981 F.2d 730, 732 (5th Cir.1992). To sustain a grant of summary judgment, the pleadings, depositions, admissions, answers to interrogatories, and affidavits must demonstrate the absence of a genuine issue of material fact. See *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 273 (1986). If the record would not allow a rational jury to find for the nonmoving party, no genuine issue remains. See *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538, 552 (1986).

Esmark first argues that it was not required to establish the existence of a genuine issue of material fact because James failed to demonstrate the absence of such issues in his summary judgment motion. Based on our review of the record, however, we agree with the district court that James satisfied his initial burden and that Esmark was required to establish the existence of a genuine issue of material fact to survive James' summary judgment motion.

The party moving for summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex,* 477 U.S. at 323, 106 S.Ct. at 2553, 91 L.Ed.2d at 274. But if the nonmoving party will bear the burden of proof on the issue at trial, "the burden on the moving party may be discharged by "showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325, 106 S.Ct. at 2554, 91 L.Ed.2d at 275.

James satisfied his summary judgment burden by pointing out to the district court that there was no evidence in the record to support Esmark's claims that he converted company property, perpetrated a fraud on the company, participated in a conspiracy to misappropriate company property, or engaged in racketeering activity. James also highlighted portions of the summary judgment record, including his own affidavit, which tended to show that, in filling Maynard's orders, he performed his duties as production control manager in a proper fashion. The burden therefore shifted to Esmark to identify genuine issues of material fact to survive James' summary judgment motion.

B.

Esmark also argues that the district court erred in finding that no genuine issues of material fact remained regarding James' involvement in the alleged scheme. Esmark contends that it has developed sufficient circumstantial evidence for a jury to infer that James conspired with Tadin and Maynard to convert Esmark property and to misappropriate Esmark funds. Our task is to examine this circumstantial evidence and determine whether it supports such an inference.

In his deposition, Maynard testified that he had been an Esmark customer since 1974, and that Tadin was his principal contact at the company. Initially, the company sent Maynard an invoice for his hosiery purchases, which he paid by check. Maynard also was paying Tadin a cash kickback to ensure his access to certain hosiery styles. After taking delivery of an order in Grenada, Maynard would hand-deliver his kickback to Tadin in Memphis.

Tadin and Maynard later altered their arrangement. Tadin began intercepting James' memoranda so that Maynard would not receive invoices from the company, and Maynard began delivering cash payments to Tadin, which included the purchase price of his hosiery orders plus his usual kickback. This arrangement led to the inventory discrepancy which Esmark eventually discovered.

In his deposition, Maynard also testified that he occasionally purchased waste hosiery directly from James. James himself testified that whenever Maynard purchased waste hosiery Maynard paid with cash. James' superiors testified that James was authorized to receive cash under these circumstances.

Esmark maintains that the circumstantial evidence in the record raises an inference from which a jury could find that James conspired with Tadin and Maynard to convert company property and misappropriate company funds. Esmark argues first that only a small portion of the cash that James received from Maynard was ever deposited into an Esmark bank account, and that therefore James must have misappropriated this money. The evidence in the summary judgment record, however, does not support this conclusion because Esmark did not keep reliable records of its cash receipts at the Grenada plant. Indeed, Van Hawthorne, Esmark's own accountant, testified that he could not identify the source of each of the company's cash deposits for the time period at issue. Because James maintains that he turned all of the cash over to Hawthorne and Esmark has produced no credible evidence refuting this point, a rational jury could not conclude from this evidence that James misappropriated the cash he received from Maynard.

Esmark next argues that it has identified over 100 orders that were filled for Maynard for which the company was not paid because the Memphis office did not issue an invoice. Esmark contends that the failure of the Memphis office to issue these invoices is a result of James' failure to transmit memoranda advising the Memphis office of these sales. This argument, however, overlooks Tadin's uncontradicted testimony that he often intercepted James' memoranda. As a result, the absence of the memoranda would not allow a rational jury to infer that James participated in the alleged conspiracy.

Finally, Esmark maintains that, contrary to company policy and good business practices, James was selling first-quality hosiery to Maynard for cash, and that this irregular practice raises an inference of improper conduct. In making this claim, Esmark relies on a statement of Wayne Mullen, one of the dock workers at the Grenada plant. In response to questioning by Esmark's attorney, Mullen stated that James often sold first-quality hosiery, as well as waste hosiery, to Maynard and that Maynard always paid for his purchases with cash. In the deposition taken by James' counsel, however, Mullen equivocated when asked about his earlier statement, saying that he had difficulty remembering all of the circumstances of Maynard's orders.[1] Given Mullen's equivocation, there is no record evidence suggesting that James ever sold first-quality hosiery to Maynard for cash. Indeed, both James and Maynard testified that all Maynard ever purchased from James was waste hosiery. As a result, a rational jury could not find that James sold first-quality hosiery to Maynard for cash.

Therefore, based on our review of the record, we conclude that the district court properly granted James' summary judgment motion. Although Esmark's evidence would allow a rational jury to find that James was in a position to misappropriate company funds, the evidence would not support a finding that he participated in such activity.

III.

A.

---

[1]The following excerpt is taken from Mullen's deposition:

Q. For what products would Mr. Maynard pay cash?

A. Well, for anything he got in the line of panty hose.

Q. Did he pay cash for waste?

A. I'm not sure....

Q. ... Are you sure that Mr. Maynard paid cash for goods other than waste?

A. To the best of my knowledge. That's all I can say. I honestly can't. It's so hard to remember every little detail back then.

Q. In other words, were there occasions when he picked up, let's say, first-quality panty hose, that he did not pay cash?

A. It possibly could've been. When it had been invoiced.

In his cross-appeal, James argues that the district court erred in granting Esmark's summary judgment motion because the evidence does not support the company's affirmative defense of qualified privilege. To maintain its qualified privilege defense, Esmark first must establish that the "occasion" of its alleged defamatory statement was qualifiedly privileged. See *Garziano v. E.I. Du Pont de Nemours & Co.,* 818 F.2d 380, 388 (5th Cir.1987). If Esmark successfully demonstrates this fact, the burden then shifts to James to show that Esmark abused its privilege through bad faith, actual malice, or excessive publication. See id. If James fails to meet this burden, Esmark is entitled to prevail on its qualified privilege defense.

Under Mississippi law, an employer enjoys "a qualified privilege when commenting on personnel matters to those who have a legitimate and direct interest in the subject matter of the communication." *Bulloch v. City of Pascagoula,* 574 So.2d 637, 642 (Miss.1990). A company's employees have a legitimate and direct interest in the reasons for a co-worker's dismissal. See *Garziano,* 818 F.2d at 387 (citing *Benson v. Hall,* 339 So.2d 570, 572 (Miss.1976)). Craig made his statement regarding a personnel matter to the supervisory employees at the Grenada plant. These Esmark employees had a legitimate and direct interest in the reasons for James' dismissal, and the district court therefore properly found that the occasion of Esmark's alleged defamatory statement was qualifiedly privileged.

Once it is determined that the occasion of an alleged defamatory statement is qualifiedly privileged, a presumption of good faith arises, which the person claiming to be defamed must rebut in order to recover. See *id.,* 818 F.2d at 388-89. James contends that he has presented sufficient summary judgment evidence of excessive publication and actual malice on the part of Esmark to rebut the presumption of good faith. We disagree.

Under Mississippi law, an employer abuses its qualified privilege through excessive publication if the scope of its statement exceeds what is necessary, or if its statement is published to persons other than those who have a legitimate and direct interest in the subject matter of the communication. See *id.* at 391-92. In support of his excessive publication argument, James points to evidence that two of Esmark's supervisors repeated Craig's statement to their wives and that

another told his sister, as well as to evidence that the reasons for his firing were known throughout Grenada shortly after it occurred.

First, with regard to the evidence of the rumors in Grenada, we are not persuaded that this evidence supports an inference that Craig's statement was excessively published. Speculation about the reasons for James' discharge was bound to occur among those rank and file Esmark employees who knew of James' dealings with Maynard and who knew the reasons for Tadin's earlier dismissal. Besides the evidence that three supervisors repeated Craig's statement to their close family members, James has presented no evidence showing that the rumors in the community stemmed from Craig's statement. It is just as likely that these rumors grew out of the gossip by Esmark employees who were speculating about the reasons James was fired after nearly 40 years with the company. Since "[a] finding of excessive publication cannot be based on speculation or surmise," *Pulliam v. Bond,* 406 S.W.2d 635, 643 (Mo.1966), a rational jury could not conclude that Craig's statement was excessively published based on the rumors in Grenada. See, e.g., *Garziano,* 818 F.2d at 393; *Manning v. Cigna Corp.,* 807 F.Supp. 889, 899 (D.Conn.1991).

With regard to the evidence that three Esmark supervisors repeated Craig's statement to members of their families,[2] James not only must show that these unprivileged persons learned of Craig's statement, but also that Craig's method of communicating his statement was unreasonable under the circumstances. As we noted in Garziano, if employers can be held liable even though they use a proper means of communicating privileged information, then "employers responding to legitimate concerns in the workplace will either be discouraged from addressing sensitive matters or held strictly liable for unauthorized repetition." 818 F.2d at 393-94.

As the Restatement (Second) of Torts explains:

> Often the only practicable means of communicating defamatory matter involves a probability or even certainty that it will reach many persons whose knowledge of it is of no value in accomplishing the purpose for which the privilege is given. In this case, the publication is not excessive or an abuse of the privilege, if the importance of the interest

---

[2]Arguably, the repetition of Craig's statement by the two supervisors to their wives is not evidence of excessive publication, given the confidential character of the relationship between husband and wife. See Restatement (Second) Tort § 592 (1977); W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 114, at 824 (5th ed. 1984).

> involved, the gravity of the harm threatened to it and the inconvenience of any other means of communication make the publication reasonable.

Restatement (Second) of Torts § 604 cmt. b (1977); see also *Zinda v. Louisiana Pac. Corp.,* 149 Wis.2d 913, 440 N.W.2d 548, 554 (1989); *Porter v. Eyster,* 294 F.2d 613, 618-19 (4th Cir.1961); see generally Laurence H. Eldredge, The Law of Defamation § 94 (1978). Although a question concerning a defendant's abuse of its qualified privilege may, in the proper case, be for the jury, if only one conclusion can be drawn from the facts, the court may summarily dispose of the issue. See Restatement (Second) of Torts § 619.

In this case, the only conclusion that could be drawn is that Esmark chose a reasonable means of informing its supervisory employees of James' dismissal. The company instructed Craig to travel from Memphis to Grenada, where he held a private, closed-door meeting with 15-20 Esmark supervisors. He told them in this private meeting that James had been fired for his involvement in a scheme to convert company property and to misappropriate company funds. The nature of the meeting demonstrated its confidential nature, and the absence of a verbal caution against repeating the statement does not render Esmark's method of communication unreasonable. Indeed, given human nature, the only way Esmark could have prevented the minor leaks from the Esmark supervisors to their immediate families that occurred here would have been to make no statement whatsoever. We therefore find that Esmark's method of informing its supervisory employees of the reasons for James' dismissal was reasonable, and that the company did not abuse its qualified privilege through excessive publication.

James also argues that Esmark abused its qualified privilege through actual malice. Under Mississippi law, actual malice exists if the speaker knew his statement was false or if he made the statement in reckless disregard for its truth or falsity. See *Southwest Drug Stores, Inc. v. Garner,* 195 So.2d 837, 842 (Miss.1967). James does not argue that Esmark knew that Craig's statement was false; instead, he argues that Esmark acted in reckless disregard of the statement's truth or falsity. To carry his burden on this issue, James must demonstrate that Craig (or others at Esmark) had "a high degree of awareness of probable falsity or serious doubt as to the truth of the statement." Restatement (Second) of Torts § 600 cmt. b (1977).

James maintains that Esmark's inability to survive his summary judgment motion demonstrates its lack of a factual basis for Craig's statement, and that therefore Esmark acted in reckless disregard of the statement's truth or falsity. Although the record will not support a finding that James participated in a scheme to misappropriate Esmark funds, the record is not wholly devoid of evidence suggesting James' involvement in such a scheme.

Indeed, James' direct sales of hosiery to Maynard and his responsibility for providing notice of "manual" orders to the Memphis office gave Esmark reason to suspect that James was involved in the scheme with Tadin and Maynard. In addition, shortly before James was dismissed, Mullen told Esmark's attorney that James was selling first-quality hosiery to Maynard for cash. Although Mullen later equivocated on this point, his initial assertion along, with James' other dealings with Maynard, would preclude a rational jury from finding that Esmark had a "high degree of awareness" of the probable falsity of Craig's statement. James therefore has failed to raise a genuine issue of material fact as to Esmark's abuse of its qualified privilege through actual malice.

B.

Finally, James argues that the district court erred in refusing to grant sanctions and attorneys' fees based on Esmark's filing of a frivolous suit and its vexatious conduct during discovery. In deciding whether the district court erred in refusing to grant sanctions under Rule 11 and attorneys' fees under 28 U.S.C. § 1927, our review is limited to determining whether the court abused its discretion. See *Cooter & Gell v. Hartmarx Corp.,* 496 U.S. 384, 405-06, 110 S.Ct. 2447, 2461, 110 L.Ed.2d 359, 381-82 (1990). A district court abuses its discretion if it bases its decision on an erroneous view of the law or on a clearly erroneous assessment of the evidence. See *id.*

Although the district court ultimately found that Esmark failed to establish that genuine issues of material fact existed regarding its claims, essentially for the reasons stated above in affirming the district court's conclusions on the actual malice issue, the court did not abuse its discretion in denying James' request for sanctions. As for Esmark's conduct during discovery, the district court was in a better position to assess the propriety of Esmark's conduct and concluded that it was not inappropriate. Based on our review of the record, we are not persuaded that the district court abused

its discretion in denying James' request for attorneys' fees.

## IV.

Because Esmark has failed to raise genuine issues of material fact as to James' participation in a scheme to misappropriate company property, we affirm the district court's grant of James' motion for summary judgment against Esmark. Because James has failed to raise a genuine issue of material fact as to Esmark's abuse of its qualified privilege through excessive publication or actual malice, we affirm the district court's grant of Esmark's motion for summary judgment against James. We also conclude that the district court did not abuse its discretion in denying James' request for sanctions and attorneys' fees.

AFFIRMED.